**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **RICHARD COUGHLIN**<br>FEDERAL PUBLIC DEFENDER | 1002 Broad Street<br>Newark, New Jersey 07102<br>(973) 645-6347   Telephone<br>(973) 645-3101   Facsimile | **CHESTER M. KELLER**<br>FIRST ASSISTANT |

July 29, 2013

Hon. Mark Falk, U.S.M.J.
United States District Court,
District of New Jersey
United States Post Office Building & Courthouse
Federal Square
Newark, New Jersey 07102

      Re: In the Matter of the Extradition of Dieuseul Jean
         Mag. No. 13-3588

Dear Judge Falk:

  Please accept this letter brief on behalf of Diesusel Jean, in lieu of a more formal brief, in response to the Government's brief dated June 11, 2013.  Mr. Jean challenges extradition to Canada on the grounds that the Government does not present sufficient evidence to establish probable cause that he was involved in the murder for which he is a suspect.  For the reasons set forth below, he asks that Your Honor make a recommendation to the Secretary of State, in a manner consistent with 18 U.S.C. § 3184, that probable cause is lacking to support the charges.

**Background**

  This matter involves the extradition of Dieuseul Jean to Quebec, Canada, based on a nearly 18 year old murder charge.  The government of Canada seeks to have Mr. Jean extradited to stand trial for the 1995 murder of his ex-girlfriend Juthlande Pierre.  In accordance with the treaty between two countries, the Government now seeks Mr. Jean's extradition on behalf of the

Canadian government.

Defendant Jean was born in Haiti, but subsequently immigrated to Quebec, Canada. He subsequently relocated to Newark, NJ sometime in late 1995 or early 1996, where he has resided since immigrating to the United States. While still living in Canada, he was admittedly involved in a relationship with Ms. Pierre. The two allegedly attended a Christmas party together in 1995 and were later seen returning to her home. Shortly after Christmas 1995, he left Canada and moved to New Jersey. Ms. Pierre was later discovered murdered in her home. According to the Government she was found dead at her home on January 15, 1996. Mr. Jean had already relocated to the United States at the time the body was discovered. The Province of Quebec, Canada considers Mr. Jean a suspect and wants to try him for the murder of Ms. Pierre.

In its petition for extradition, the Government relies extensively and exclusively on the Summary of Facts ("Appendix D"), provided by the Canadian government prepared by the Director of Criminal and Penal Prosecutions from the Province of Quebec. For various reasons discussed in Appendix D, the Government contends and they have discovered evidence that incriminates Mr. Jean in Pierre's death. Mr. Jean vehemently denies that he was involved in her death. Importantly, he has not been tried or convicted on these charges. Regarding the extradition motion, Mr. Jean challenges the extradition because he respectfully submits the Government, and by extension Canada, do not have sufficient and reliable evidence establishing probable cause.

**Legal Standard**

Initially, this matter is largely controlled by the United States-Canada Extradition Treaty. Dec 3, 1971, 27 U.S.T. 983. Thus, the Executive branch controls many aspects of the extradition process. *See Sidali v. I.N.S.*, 107 F.3d 191, 194 (3d Cir. 1997) (discussing the President's power

2

to conduct foreign affairs); *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006). The Constitution and federal law limit the judiciary's role in an extradition hearing. *See id.* (analyzing 18 U.S.C. §§ 3181-95 and Article II of the Constitution). Nevertheless, courts perform an important function that guards the rights of the accused, protecting that individual from an arbitrary and baseless extradition. See 18 U.S.C. § 3184 (instructing that a court must determine if there is "evidence sufficient to sustain the charge"). Notably The extradition treaty provides that:

> [e]xtradition shall be granted *only if the evidence be found sufficient*, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

Treaty on Extradition, U.S.-Can., art. 10(1) Dec 3, 1971, 27 U.S.T. 983. (emphasis added). Therefore, it is the role of this Court to determine if "probable cause supports the charges." *Hashbarger v. Regan*, 599 F.3d 290, 292 (3d Cir. 2010). Mr. Jean submits that the Government offers insufficient evidence to establish probable cause for extradition under the treaty.

Pursuant to 18 U.S.C. § 3184 and the Extradition Treaty between the United States and Canada, a federal court may only order extradition if (1) the Court possesses subject matter jurisdiction, (2) the Court may exercise personal jurisdiction over the defendant, (3) the Government's extradition request identifies the person before the Court, (4) a valid treaty exists, (5) that treaty covers the alleged crime(s), and (6) the Government offers competent evidence that supports a finding of probable cause for the crimes accused. *See Sidali*, 107 F.3d at 194 (3d Cir. 1997); *see also In re Extradition of Harshbarger*, 600 F. Supp. 2d 636, 641-42 (M.D. Pa. 2009). In this case, Mr. Jean challenges extradition because he contends that the Government's evidence is insufficient to constitute probable cause.

To determine if the evidence supports a finding of probable cause, the court will apply

the same standard used in federal preliminary hearings. *Sidali,* 107 F.3d at 199. Thus, to prove probable cause, the Government bears the burden to provide "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt [for the charged crime]." *Id.* "In determining whether there [i]s evidence 'warranting the finding [of probable cause],' . . . properly authenticated '[d]epositions, warrants, or other papers . . . offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence [at the] hearing.'" *Harshbarger v. Regan*, 599 F.3d 290, 293 (3d Cir. 2010) (quoting 18 U.S.C. § 3190 (2009). Often, a court will consider numerous sworn affidavits and physical evidence. *See, e.g.*, *In re Extradition of Harshbarger*, 600 F. Supp. at 638-39. A finding of probable cause must be well-grounded in facts. *See In re Extradition of Bolanos*, 594 F. Supp. 2d 515, 520 (D.N.J. 2009) (emphasizing the importance of facts to corroborate allegations); *see also United States v. Peterka*, 307 F. Supp. 2d 1344, 1350 (M.D. Fla. 2003) (denying extradition where the evidence did not amount to probable cause because "[an individual's] stated suspicion . . . has little probative value without supporting facts.") For example, mere presence at the scene and opportunity to commit the alleged crime does not constitute probable cause. *See Sidali*, 107 F.3d at 200 (determining that the Government's evidence proved significantly more than presence and opportunity).

When considering whether the evidence presented constitutes probable cause, the court should remember that the structure and rules of an extradition hearing puts the individual facing extradition at a severe disadvantage. First, the accused may not generally seek discovery. *See Matter of Extradition of Singh,* 123 F.R.D. 108, 111 (D.N.J. 1987). Also, an individual facing extradition may only introduce limited evidence. *See Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) (distinguishing between the admissible "explanatory evidence" and the inadmissible

"contradictory evidence"). Discussing the limited evidence that a person facing extradition may present, the Third Circuit explained,

> [c]ourts have traditionally distinguished between inadmissible "contradictory evidence," which merely conflicts with the government's evidence, and admissible "explanatory evidence," which entirely eliminates probable cause. See, e.g., Barapind v. Enomoto, 360 F.3d 1061, 1069 (9th Cir.2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir.1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted). In practice, this line is not easily drawn, but the rule serves the useful purpose of allowing the defendant "to present reasonably clear-cut proof ... of limited scope [that has] some reasonable chance of negating a showing of probable cause," while preventing the extradition proceedings from becoming "a dress rehearsal trial." Koskotas, 931 F.2d at 175 (internal quotation marks omitted).

Hoxha, 465 F.3d at 561. The inability to introduce most evidence is not the only structural disadvantage that the accused faces.

In contrast to the significant limitations placed on the party challenging extradition, there are few restrictions on what evidence the Government may introduce on behalf of the nation seeking to extradite the individual. Notably, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not normally apply in an extradition hearing, including the prohibition against hearsay and the authentication requirements for records and reports. *See Bolanos*, 594 F. Supp. 2d at 519-20; *see also Harshbarger v. Regan*, 599 F.3d at 293. This is problematic because uncorrabrated hearsay could be used against an individual, but hearsay evidence alone without satisfactory corroboration can lead to erroneous conclusions. *See United States v. Lloyd*, 566 F.3d 341, 346 (3d Cir. 2009) ("Although police reports are neither 'inherently reliable [nor] ... inherently unreliable,' *United States v. Leekins,* 493 F.3d 143, 149 (3d Cir.2007), the reports at issue in this case are uncorroborated and rely on an account . . . that

may have been colored by animus against [defendant] Lloyd. This . . . weigh[s] against reliability."). Also, the Supreme Court has emphasized that scientific reports may be riddled with bias without adequate procedural and evidentiary safeguards. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318 (2009) ("A forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution."). Moreover, without corroboration and cross-examination, inaccuracies may go unnoticed. *See id.* at 320-21 (noting the "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, [and] general acceptability" that unaddressed yield "subjectivity, bias, and unreliability of common forensic tests such as latent fingerprint analysis, pattern/ impression analysis, and toolmark and firearms analysis.")

Photographic evidence can also be problematic. Often, the police attempt to place an individual at a crime scene by asking interviewees to view a set of photographs to identify a person depicted therein. The Supreme Court has long emphasized the problems associated with photographic identification. *See Darden v. Wainwright*, 477 U.S. 168, 199 (1986) ("The use of showups has long been condemned by this Court, precisely because they can result in unreliable identifications."). Because of its inherent unreliability, police must use extreme care to ensure reliability when seeking photographic identification. Displaying a photograph of only one individual to a potential witness or victim is one of the most egregious and flagrant violations of a reliable identification procedure. *See Manson v. Brathwaite*, 432 U.S. 98, 109 (1977) ("[T]he procedure in the instant case was suggestive because only one photograph was used and unnecessary because there was no emergency or exigent circumstance."). Courts normally consider that the display of a single photograph for suspect identification is so improper that it

not only undermines that particular out-of court identification, but also any future in-court identification of a suspect because the display of a single photograph is so inherently suggestive of guilt. *See id; see also Darden,* 477 U.S. at 199. Also, some courts presume that a pre-trial photographic line-up is "impermissibly suggestive" where the police do not produce or preserve the photographs used to identify a suspect. *United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000).

Finally, in evaluating the existence or absence of probable cause, the court should consider the age of information relied on in a warrant. *See United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993). "If too old, the information is stale, and probable cause may no longer exist." McNeese, 901 F.2d at 596. In assessing staleness, the court should examine the type and age of evidence to determine reliability. *See* United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993).

In sum, the reliability of the evidence that the Government bases this motion on is questionable.

**Legal Analysis**

**I. The Court Should Deny the Government's Extradition Request for Lack of Probable Cause.**

In this case, the Canadian authorities provided the Government with evidence that does not rise to the level of probable cause. The Government relies solely on Appendix D (summary of facts) to set forth the evidence against Jean. Appendix D exhibits serious flaws on its face and when the specific facts presented are distilled the evidence is not sufficient to establish probable cause. When viewed holistically, the evidence suggests only that someone killed the victim and

that Jean and others may have been in close proximity to the crime scene within several days or weeks of the crime. The Government does not provide any sworn affidavits of any persons who conducted the investigation or were interviewed in connection with the murder. The Government does not offer any reports, depositions, physical evidence, or any other evidence. Given the significant reliability concerns of uncorroborated hearsay evidence, the staleness of any evidence still in existence, the absence of critical evidence, and poor investigation practices generally, the Government's case cannot amount to probable cause.

**A.  Appendix D Highlights that the Government's Case Possesses Fatal Structural Flaws.**

Again, the Government relies on Appendix D to establish probable cause for extradition. However, this document is flawed and unreliable. First, the document was not prepared by someone with firsthand knowledge of the underlying criminal case. According to the Canadian prosecutor, Sergeant Antonio Paradiso wrote Appendix D. Sergeant Paradiso did not provide this statement under oath. Sergeant Paradiso's connection to this case appears attenuated at best and wholly detached at worst. Sergeant Paradiso does not claim to possess personal knowledge of anything written in Appendix D and does not explain how he learned of the facts included in Appendix D. He does not claim that he spoke to any investigators involved in the case or the investigator in charge of the file, Detective Sergeant Paul Langlais. The Government does not give any reason why those personally involved in the case's investigation did not provide sworn affidavits or otherwise contribute to the Government's extradition request. In crafting Appendix D, Sergeant Paradiso does not state that he personally viewed any of the purported evidence, conferred with any expert about scientifically based reports, or even reviewed police reports related to the case.

Additionally, a significant portion of the "evidence" is non-specific, unverifiable, and uncorroborated. In two separate places within Appendix D, the Government simply states that "the investigation show[s/ed]" something to be true, without stating what evidence or facts support that conclusion. None of the statements that Sergeant Paradiso cites in Appendix D are sworn statements. The police did not provide any evidence to corroborate statements given by the individuals allegedly interviewed.

Moreover, the staleness of any evidence discounts its reliability. For example, because it appears that the police have not followed up with the persons giving statements in connection with Appendix D since 1995 or 1996, these individuals may be wholly unavailable, not remember facts clearly or even recant their testimony. Also, the Government did not allege that any purported physical evidence is still available and uncorrupted. These overarching flaws and inconsistencies with Appendix D negate any basis under which the court could find of probable cause.

**i. Identification Techniques Used by the Authorities Are Unreliable**

The Government provides two photographs, taken a short time apart, that it believes are pictures of Jean. The first photograph shows Jean with his arm around his cousin, Cadet Alourdes. Alourdes allegedly provided this personal photograph to the investigators. Jean agrees that Alourdes' photograph is authentic.

In contrast, the second picture is a photograph used for an arrest warrant. Jean does contest that he is the person pictured in the second photograph. The second photograph appears to be associated with a prior arrest that occurred on April 10, 1995. Critically, the arrest warrant (document titled "Montreal Urban Community Wanted") indicates that police took this

9

photograph on April 8, 1995; however, the fingerprints associated with Jean were taken two days later on April 10, 1995. This supports Jean's contention that the second photograph depicts someone other than Jean, likely someone else arrested on April 8, 1995. If one observes these two photographs side by side, it is obvious that these photographs do not depict the same man. While an individual's facial features may change with time or by one's own initiative, the facial features that are nearly impossible to change without serious cosmetic surgery— i.e. nose, hairline, cheek bone structure, and mouth shape— are inconsistent between the two pictures.

Based on the investigation timeline, the Government's investigation relied on the photograph that does not picture Jean. Alourdes provided her authentic photograph to the Montreal police on January 17, 1996. According to Appendix D, the police may have interviewed several persons in connection with the investigation prior to receiving Alourdes' photo that identifies Jean. Standard practice dictates using an arrest photo when available to identify a potential suspect. The police did not disclose how they asked interviewees to identify Jean, if they even asked at all. If they did attempt to obtain positive identification of Jean from interviewees, one can only assume that the investigators in 1996 used only the arrest picture that does not picture Jean. This seriously flawed and highly suggestive identification process casts serious doubt on each and every interview allegedly conducted by the police in connection with this case. This alone undermines probable cause.

## B. Specific Fact Patterns in Appendix D Show Fatal Defects.

Appendix D contains several illogical, inconsistent and unbelievable fact patterns. These fact patterns contain glaring omissions or errors, and suggest questionable investigation practices. Moreover, the Government did not turn over any of this purported evidence. These

10

factors weigh strongly against finding probable cause exists to extradite Mr. Jean.

For instance, Appendix D notes that Marie Luce Alteme stated to someone (presumably an investigator) that she babysat Pierre's child on Christmas of 1995. She stated that Jean requested that she give him Pierre's child on December 26, 1995 but that she denied his request. Interestingly, Alteme did not contact the police despite Pierre not returning for her child or contacting her in the three weeks that followed Christmas of 1995. During this time, Alteme continued to care for Pierre's child without receiving any further authorization or direction from Pierre. It appears from the report that she did not make any effort to locate or contact Pierre. She never visited Pierre's home to try to locate her. Alteme's conscious failure to contact the police or attempt to contact Pierre is highly suspicious and casts doubt on her candor with police.

Next, the Government alludes to physical evidence and scientific reports but fails to provide even the most basic corroboration or authentication of this purported evidence. According to the Government, Andre Richard stated that Jean borrowed and returned a hammer on December 26, 1995, and later drove away from the area in a blue General Motors ("GM") vehicle. It appears that the police never seized nor inspected the hammer, nor the GM vehicle. Also, the Government never mentions obtaining or testing any weapon. Additionally, the Government concludes that a bracelet found at the scene matches one worn by Jean. The Government, however, does not provide a picture of the bracelet found at the scene. It does not explain how the two bracelets are similar other than possibly both being made of white gold or silver. Finally, the Government claims that a purse of personal documents connects Jean to the scene. The Government does not provide pictures of evidence found at the scene, describe the documents, or disclose why they believe that they were Jean's papers (e.g. his name appeared on the documents). The Government did not include any forensic reports although Appendix D

states that a forensic investigation took place. Notably, the Government did not provide a copy of the autopsy for Jean or the Court to review. Although the Government conducted an autopsy, the Government does not give the approximate time or date of Pierre's death. Certainly a three week old corpse would exhibit some signs of decomposition or other notable characteristics that indicate the approximate time of death. Based on the lack of evidence to the contrary, it seems more likely that Pierre died shortly before her landlord discovered her body. Other than a missed phone call or two, no evidence supports the proposition that Pierre did not die in mid-January. A few missed phone calls standing alone does not support that she died in December, especially where there is no indication that Pierre owned an answering machine. Additionally, it does not appear that an expert has reviewed any forensic or physical evidence since 1996 or that the methods used in 1996 conform to the scientific and investigative standards of today.

**Conclusion**

Considering the investigatory flaws, the staleness of the evidence, the lack of evidence suggesting when Pierre died, and the uncorroborated nature of unreliable hearsay, the crux of the evidence presented by the Government supports only that Jean had visited Pierre or Pierre's home on some occasion prior to or after her death. For these reasons, the Court should find that the Government failed to produce sufficient evidence to cause Jean's extradition to Canada. Accordingly, the Court should deny the Government's motion.

                                              Respectfully submitted,

                                              /s/
                                              Lorraine Gauli-Rufo
                                              Assistant Federal Public Defender
                                              Attorney for Dieuseul Jean